

**SO ORDERED.**

**SIGNED this 1st day of July, 2014.**



*Catharine R Aron*
_____
UNITED STATES BANKRUPTCY JUDGE

---

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## WINSTON-SALEM DIVISION

| | | |
|---|---|---|
| **In re:** | ) ) ) ) | |
| **Linda Sue Teaster Hamilton** | ) ) | **Case No. 13-51213** |
| **Debtor.** | ) ) ) ) | |

### MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISMISS

This matter came before the Court on April 2, 2014 upon the Bankruptcy Administrator's timely-filed Motion for Dismissal of Case Pursuant to Sections 707(b)(1),(2), and 707(b)(3). Appearing before the Court were Thomas Anderson, attorney for the Debtor, and Robert E. Price, Jr., for the Office of the United States Bankruptcy Administrator (the "BA"). The Court makes the following findings of fact and conclusions of law.

### JURISDICTION

This Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334 and Local Rule 83.11 of the United States District Court for the Middle District of North Carolina. This is a core proceeding under 28 U.S.C. § 157(b)(2) which this Court may hear and determine.

## FACTS

Linda Sue Teaster Hamilton (the "Debtor") filed an individual petition for relief under Chapter 7 of Title 11 of the United States Code ("Bankruptcy Code") on October 1, 2013. "Individuals who file for bankruptcy relief under Chapter 7 liquidate their nonexempt assets, rather than dedicate their future income, to repay creditors. *See* 11 U.S.C. §§ 704(a)(1), 726." *Ransom v. FIA Card Services, N.A.*, 131 S. Ct. 716, 722 n.1 (2011). Among the secured debts that the Debtor listed on the form used for reporting such debts (Schedule D) are a first mortgage in the amount of $59,098.10, held by BB&T Mortgage, and a second mortgage in the amount of $60,976.39, held by Allegacy Federal Credit Union. Both debts are secured by the Debtor's residence.

The Debtor did not assert intent either to surrender or to retain her home, although required to do so by law. 11 U.S.C. § 521(a)(2)(A).[1] The Debtor also did not claim the residence as exempt under 11 U.S.C. § 522, which would have rendered it "not liable during or after the case for any debt of the debtor that arose…before the commencement of the case." 11 U.S.C. § 522(c). On the form used for reporting monthly expenses (Schedule J), the Debtor listed combined monthly mortgage payments of $1,493 as among her current expenditures. The parties stipulate that both prior to and after filing her petition, the Debtor sought a mortgage modification. The parties further stipulate that the Debtor's last full mortgage payments were in April 2013 (on the first mortgage) and March 2013 (on the second mortgage). Since the filing of

---

[1] In relevant part, § 521(a)(2)(A) provides that "[t]he debtor shall…if an individual debtor's schedule of assets and liabilities includes debts which are secured by property of the estate…within thirty days after the date of the filing of a petition under chapter 7 of this title or on or before the date of the meeting of creditors, whichever is earlier, or within such additional time as the court, for cause, within such period fixes, file with the clerk a statement of his intention with respect to the retention or surrender of such property and, if applicable, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property."

the petition, there has been no indication that the Debtor has made additional mortgage payments, nor that the Debtor explicitly has surrendered the property, nor that the creditors have in any manner forgiven the debts.

Pursuant to the requirements of 11 U.S.C. § 707(b)(2)(C), the Debtor included with her petition a statement of "current monthly income" ("CMI") and a calculation commonly referred to as the "means test." As used here, CMI is a defined term meaning "the average monthly income from all sources that the debtor receives…derived during the 6-month period ending on…the last day of the calendar month immediately preceding the date of the commencement of the case." 11 U.S.C. § 101(10A). The Debtor lists a CMI of $5,923.58.

The means test uses a debtor's CMI as a component of a statutory formula that prescribes when the court must presume a filing to be an abuse of the provisions of Chapter 7. 11 U.S.C. § 707(b)(2).[2] A court must dismiss an abusive filing or, if the debtor consents, convert it to a case under Chapter 13. 11 U.S.C. § 707(b)(1). While the Bankruptcy Code contemplates circumstances under which the presumption of abuse may be rebutted, the parties stipulate that none are present in this case. *See* § 707(b)(2)(B). Finally, "[i]n cases where the presumption does not arise or is rebutted, the court still must determine whether granting a debtor relief would be [abusive] by considering 'whether the debtor filed his petition in bad faith' and/or by considering 'the totality of the circumstances ... of the debtor's financial situation.'" *Calhoun v. U.S. Trustee*, 650 F.3d 338, 341 (4th Cir. 2011) (citing 11 U.S.C. § 707(b)(3)).

---

[2] Not all debtors are subject to the means test. Under § 707(b)(7)(A)(i), no party may file a motion to dismiss under § 707(b)(2) if a Debtor has a CMI "when multiplied by 12" that is "equal to or less than…the median family income…for 1 earner." Here, the Debtor's CMI multiplied by 12 equals $71,082.96 and the relevant median family income for one earner is $40,710. *See* 11 U.S.C. § 101(39A)(B) (defining "median family income"); State Median Family Income by Family Size, May 1, 2013 to November 14, 2013, *available at* http://www.justice.gov/ust/eo/bapcpa/20130501/bci_data/median_income_table.htm (website for the U.S. Trustee Program, providing the relevant figures for median family income). Thus, being above-median, the Debtor was required to provide "the calculations that determine whether a presumption arises." 11 U.S.C. § 707(b)(2)(C).

A presumption of abuse arises under § 707(b)(2)(A)(i) if "the debtor's [CMI] reduced by the amounts determined under [subsequent] clauses (ii), (iii), and (iv), and multiplied by 60" equals or exceeds $12,475.[3] In this case, among the "amounts determined under clauses (ii), (iii), and (iv)" that the Debtor has deducted from her CMI are those that she contends fall under § 707(b)(2)(A)(iii): "the debtor's average monthly payments on account of secured debts." First, pursuant to subsection (I) of that provision, the Debtor purports to properly deduct a $1,493 combined monthly mortgage payment as comprising "the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition," divided by sixty. 11 U.S.C. § 707(b)(2)(A)(iii)(I).

Second, pursuant to subsection (II) of § 707(b)(2)(A)(iii), the Debtor purports to deduct a $182.93 combined monthly mortgage cure payment as comprising "additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence," divided by sixty. 11 U.S.C. § 707(b)(2)(A)(iii)(II). Ultimately, the Debtor lists expenses totaling $5,825. Using these figures, the Debtor applies the means test prescribed in § 707(b)(2)(A) as follows: the Debtor's CMI of $5,923.52 reduced by purportedly permissible expenses of $5,825 equals $98.52; that amount multiplied by sixty equals $5,911.20, which does not exceed $12,475. As such, the Debtor submits that her case cannot be dismissed based on presumptive abuse.

On December 12, 2013, the BA filed a motion to dismiss under § 707(b), alleging that the Debtor intends to surrender the home and that the mortgage and mortgage cure deductions are

---

[3] More precisely, a debtor's CMI, so reduced, triggers a presumption of abuse under § 707(b)(2)(A)(i) when it "is not less than the lesser of—(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $7,475, whichever is greater; or (II) $12,475." The $12,475 figure applies in this case.

therefore improper.[4] The BA contends that those amounts should instead be included in the Debtor's income and that she should take what would be, by the parties' stipulation, the applicable IRS Housing and Utility standard deduction—$867. The BA correctly notes that if the Debtor were to take the standard deduction and move either or both of her claimed mortgage deduction amounts to her income, her recalculated sixty-month disposable income would exceed $12,475. In that event, the Debtor's filing would be presumptively abusive and it would have to be dismissed or converted to a case under Chapter 13.

The BA contends that precedent of the United States Supreme Court and of the Court of Appeals for the Fourth Circuit establishes that, in implementing the Chapter 7 means test, mortgage payments on real property which a debtor intends to surrender do not qualify as "amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition." Likewise, the BA contends that mortgage cure payments on real property which a debtor intends to surrender do not qualify as "additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of [title 11], to maintain possession of the debtor's primary residence."

Acknowledging that the Debtor's "Statement of Intention" under § 521(a)(2)(A) does not indicate intent to surrender the residence, the BA contends that such intent is revealed in four ways. First, the BA points to the following exchange between the BA and the Debtor at the meeting of creditors held pursuant to 11 U.S.C. § 341:

MR PRICE: ... Are you planning to keep your house?

---

[4] In order for the BA to be able to move for dismissal under § 707(b), a debtor's debts must be primarily consumer debts. 11 U.S.C. § 707(b)(1). The parties stipulate that this condition is satisfied here.

MS. HAMILTON: Probably not, sir, because I have developed asthma. I can't do the yard work, and I certainly can't afford to pay anyone to do it for me. And there are – there –there's just upkeep I can't do anymore.

****

MR PRICE: So it sounds to me like what you are saying is that with – with – with regret you have made a decision to most likely give up your house and –

MS. HAMILTON: Probably.

MR. PRICE: Probably – and that you are looking for another place to live. But of course, you got a little bit of time –

MS HAMILTON: Right

Memorandum of the BA in Support of Motion to Dismiss at 2-3.

Second, the BA points to the Debtor's failure to claim the property as exempt. Third, the BA points to the fact—stipulated by the parties—that approximately one month after the petition was filed, and absent opposition from the Debtor, this Court granted a motion filed by BB&T for relief from stay as to the property. Finally, the BA points to BB&T's representation, in its motion for relief from stay, that the Debtor was at that time six months in arrears on mortgage payments. Relatedly, the BA points to the fact that, according to the Debtor's Statement of Financial Affairs, filed pursuant to 11 U.S.C. § 521(a)(1)(B)(iii) and Fed. R. Bankr. P. 1007(b)(1), the Debtor made no payments to BB&T in the ninety days preceding the filing of her petition.

The Debtor has two responses. First, the Debtor argues that the evidence the BA offers is insufficient to prove that the Debtor intended to or intends to surrender the real property. What is more, the Debtor next argues, the Bankruptcy Code does not grant this Court discretion to stray from what the Debtor contends § 707(b)(2)(A)(iii) commands: that where she remains

contractually obligated to pay mortgage and mortgage cure payments, she categorically may deduct those expenses in the means test calculation, irrespective of whether or not she intends to surrender the home. To the Debtor, the phrase "scheduled as contractually due" is the operative phrase of § 707(b)(2)(A)(iii). In support of her position, the Debtor argues that the discretion implicitly granted courts under the BA's reading renders superfluous the requirement in § 707(b)(3) that courts undertake a "totality of the circumstances" inquiry in the event the presumption of abuse either does not arise, or does arise but is rebutted.

This Court has examined the relevant statutory text and considered binding precedent, the reasoning set forth in the parties' briefs, and other persuasive sources. Bound by reasoning set forth in *Ransom v. FIA Card Services, N.A.*, 131 S. Ct. 716 (2011), this Court concludes that in implementing the Chapter 7 means test, a debtor may not deduct secured debt payments on collateral the debtor does not intend to retain. In this case, this Court finds by a preponderance of the evidence that the Debtor does not intend to retain her home. The Debtor must take the standard housing deduction and move both of her claimed mortgage deduction amounts to her income. The Debtor's recalculated sixty-month disposable income exceeds $12,475, rendering her filing presumptively abusive. No special circumstances exist to rebut this presumption. As such, this Court grants the BA's motion. Section 707(b)(3) need not be reached.

## DISCUSSION

This case presents the "purely legal question" of whether, in a Chapter 7 bankruptcy proceeding, secured debt payments may be deducted under § 707(b)(2)(A)(iii) if the debtor does not intend to retain the property securing the debt. *McDow v. Dudley*, 662 F.3d 284, 290 (4th Cir. 2011) (citation omitted). The two provisions at issue here are companion subsections, each describing an expense that, when summed with the other and divided by sixty, exclusively

comprises the permissible deduction amount for "the debtor's average monthly expenses on account of secured debts." 11 U.S.C. § 707(b)(2)(A)(iii). Consistent with the instruction of the Court of Appeals for this Circuit that courts construe statutes to "fit, if possible, all parts into an harmonious whole," this Court examines these subsections consecutively. *In re Rowe*, 750 F.3d 392, 396 (4th Cir. 2014) (citations and internal quotation marks omitted).

I. Interpretation of Section 707(b)(2)(A)(iii)(I)

"Interpretation of the Bankruptcy Code starts where all such inquiries must begin: with the language of the statute itself." *Ransom,* 131 S. Ct. at 723 (2011) (citation and internal quotation marks omitted). If the statute is unambiguous on its face, we must enforce the statute's language as written without looking for other indications of Congressional intent. *In re Bateman*, 515 F.3d 272, 282 (4th Cir. 2008) (quoting *Lamie v. United States Tr*., 540 U.S. 526, 534 (2004)). As noted, the first subsection at issue, § 707(b)(2)(A)(iii)(I), provides that part of the sum comprising the permissible deduction for "the debtor's average monthly expenses on account of secured debts" is "the total of all amounts scheduled as contractually due to secured creditors in each month of the sixty months following the date of the filing of the petition," divided by sixty. The BA and the Debtor disagree about the scope of this provision. What is the proper interpretation?

"Correctly reading a statute 'demands awareness of certain presuppositions.'" *Bond v. United States*, 134 S. Ct. 2077, 2088 (2014) (quoting Felix Frankfurter, "Some Reflections on the Reading of Statutes," 47 *Colum. L. Rev.* 527, 537 (1947)). A controlling presupposition in this case derives from the United States Supreme Court's interpretation, in *Ransom*, of subsection (I) in § 707(b)(2)(A)(ii)—the provision that immediately precedes the one at issue here.

*Ransom* involved a case filed under Chapter 13 of the Bankruptcy Code. A Chapter 13 filing "enables an individual to obtain a discharge of his debts if he pays his creditors a portion of his monthly income in accordance with a court-approved plan." *Ransom,* 131 S. Ct. at 721 (citing 11 U.S.C. § 1301 *et seq*.). A condition of court approval is that the "plan provides that all of the debtor's projected disposable income to be received [during the plan] …will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(B). As used in this provision, the figure comprising "disposable income" is defined as "[CMI]…less amounts reasonably necessary to be expended." 11 U.S.C. § 1325(b)(2). In addition, the figure comprising "amounts reasonably necessary to be expended" is defined by reference to § 707(b)(2)(A)—the same provision governing expenses in the Chapter 7 means test (indeed, the regime just described is often referred to as the Chapter 13 means test). 11 U.S.C. § 1325(b)(3).

Among the assets reported by the debtor in *Ransom* was a car that he owned free of any debt. In calculating his monthly expenses for the means test, the debtor claimed a deduction for car loan payments under § 707(b)(2)(A)(ii)(I), which authorizes deductions for "the debtor's applicable monthly expense amounts" in certain expense categories that are specified by reference to Internal Revenue Service standards. When the debtor proposed a plan, a creditor objected, contending that it is impermissible for a debtor to deduct a car loan payment as among "the debtor's *applicable* monthly expense amounts" when he in fact has no such loan obligation (emphasis added). To do so, argued the creditor, violates the requirement of § 1325(b)(1)(B) "that all of the debtor's projected disposable income to be received [during the plan] …will be applied to make payments to unsecured creditors under the plan."

The debtor countered that "the word 'applicable' serves a function wholly internal to the [IRS standards]; rather than filtering out debtors for whom a deduction is not at all suitable, the

term merely directs each debtor to the correct…dollar amount of deduction…within [the IRS standards]." *Ransom*, 131 S. Ct. at 726. To the debtor, ownership of the car was enough to claim a deduction for car loan payments, irrespective of whether or not the car remained security for a debt.

*Ransom* thus turned on the meaning of the word "applicable." Ultimately, the Court agreed with the creditor that "[w]hat makes an expense amount 'applicable' [is] its correspondence to an individual debtor's financial circumstances." *Ransom*, 131 S. Ct. at 720-721. "If a debtor will not have a particular kind of expense during his plan," reasoned the Court, "an allowance to cover that cost is not 'reasonably necessary'" under § 1325(b)(2). *Ransom*, 131 S. Ct. at 726. Importantly, in examining the phrase "the debtor's applicable monthly expense amounts," the *Ransom* Court found support for its conclusion not only through its interpretation of the word "applicable," but also through its interpretation of the phrase "the debtor's." "The statute," stressed the Court, "underscores the necessity of making…an individualized determination by referring to '*the debtor's* applicable monthly expense amounts,' § 707(b)(2)(A)(ii)(I) (emphasis added)—in other words, the expense amounts applicable…to each particular debtor. Identifying these amounts requires looking at the financial situation of the debtor." *Ransom*, 131 S. Ct. at 724.

Section 707(b)(2)(A)(iii), the provision at issue in the case before this Court, also includes the phrase "the debtor's." And because "identical words used in different parts of the same statute are ... presumed to have the same meaning," *Robers v. U.S.*, 134 S. Ct. 1854, 1855 (2014) (citation and internal quotation marks omitted), this Court presumes that "the debtor's" means the same thing in § 707(b)(2)(A)(iii) that it does in § 707(b)(2)(A)(ii)(I). In other words, "the debtor's average monthly payments on account of secured debts" comprises the average

monthly payments on account of each particular debtor's secured debts; and identifying these payments requires looking at the financial situation of each debtor in order to determine whether "the debtor will incur that kind of expense." *Ransom*, 131 S. Ct. at 724.

The Debtor in this case focuses not on the phrase "the debtor's," which begins § 707(b)(2)(A)(iii), but rather on the phrase "scheduled as contractually due," which appears in one of § 707(b)(2)(A)(iii)'s two, component subsections. *See* § 707(b)(2)(A)(iii)(I). To the Debtor, the central interpretive question is, does this phrase connote a categorical approach, in which "scheduled" refers to "the common dictionary meaning…(i.e. 'To plan for a certain date')"; or does it connote an individualized approach, in which "scheduled" refers to "whether a debt is [properly] identified on a debtor's bankruptcy schedules"? *Cf. In re Sterrenberg*, 471 B.R. 131, 133 (Bankr. E.D.N.C. 2012). If the categorical approach, should not this arguably more specific rule in § 707(b)(2)(A)(iii)(I) (covering permissible deductions for secured debt payments), control the more general authorization in § 707(b)(2)(A)(ii)(I) (covering a larger set of permissible deductions for "the debtor's applicable monthly expense amounts")— notwithstanding *Ransom*'s individualized approach to the latter? Following the approach taken by the Court of Appeals for the First Circuit, the Debtor undertakes to defend the categorical approach on such grounds. *See In re Rudler*, 576 F.3d 37, 45 (1st Cir. 2009).

After *Ransom*, however, the issues raised by such questions are immaterial. Whatever the phrase "scheduled as contractually due" might mean in the *absence* of the phrase "the debtor's," an individualized character necessarily inheres in it in § 707(b)(2)(A)(iii), where it occupies a clause that is subordinate to the one containing "the debtor's." "It is true that specific statutory language should control more general language when there is a conflict between the two. Here,

however, there is no conflict. The specific controls but only within its self-described scope." *Natl. Cable & Telecomm. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 335-36 (2002).

The Debtor and some courts resist extension of *Ransom* to Chapter 7 cases, contending that the "forward looking approach applies to cases filed under Chapter 13 and to the calculation of 'projected disposable income' under § 1325 ... [but] it does not apply to the determination of 'disposable income' and whether the presumption of abuse arises under § 707(b)(2) in chapter 7 cases." *In re Fredman*, 471 B.R. 540, 552 (Bankr. S.D. Ill. 2012) (quoting and subsequently criticizing *In re Vecera*, 430 B.R. 840, 844 (Bankr.S.D.Ind.2010)). However, "[a]lthough the *Ransom* Court found support for its interpretation from the context of § 1325(b)(3) and that section's definition of disposable income for purposes of a Chapter 13 plan, *see* [*Ransom,* 131 S. Ct.] at 724–25, the Court's holding was in no way limited to Chapter 13 cases." *In re Wilson*, 454 B.R. 155, 157 (Bankr. D. Colo. 2011). Indeed, in the very first footnote of its opinion, the *Ransom* Court seems to go out of its way to note that "Chapter 13 borrows the means test from Chapter 7, where it is used as a screening mechanism to determine whether a Chapter 7 proceeding is appropriate." *Ransom*, 131 S. Ct. at 722 n.1. This "borrowing" suggests that courts should not read § 707(b)(2)(A) one way for Chapter 7 cases, and another way for Chapter 13 cases.

Consideration of the purposes behind BAPCPA's reforms of Chapter 7 and Chapter 13 strengthens this conclusion, notwithstanding the suggestion by the Debtor, and some courts, that the distinct purposes underlying these two forms of bankruptcy impinge upon the manner in which the means test should operate in either of them. *See, e.g.*, *In re Johnson*, 503 B.R. 447, 450 (Bankr. N.D. Ind. 2013) ("there is a significant difference between chapter 13, where the

goal is to pay creditors out of projected disposable income, and chapter 7, where the goal is liquidation and discharge and the court is not required to project debtor's [sic] future resources").

"Congress adopted the means test—'[t]he heart of [BAPCPA's] consumer bankruptcy reforms,' H.R.Rep. No. 109–31, pt. 1, p. 2 (2005) (hereinafter H.R. Rep.), and the home of the statutory language at issue [in *Ransom*]—to help ensure that debtors who *can* pay creditors *do* pay them." *Ransom*, 131 S. Ct. at 721 (emphasis in original). Importantly, the House Report cited in *Ransom* goes on, in similar fashion, to note that one factor motivating reform of Chapter 7 "relate[d] to the fact that [although] some bankruptcy debtors are able to repay a significant portion of their debts[,]…in determining whether substantial abuse would occur in a chapter 7 case, there are differences among the courts as to the extent to which they rely on a debtor's ability to repay." H.R. Rep. at pt. 1, p. 5. That a similar purpose motivated BAPCPA's reforms of Chapter 7 and Chapter 13 supports the conclusion that § 707(b)(2)(A) should be interpreted identically in Chapter 7 and Chapter 13 cases.

Furthermore, even assuming, without deciding, that certain differences between Chapter 13 and Chapter 7 cases might, in some circumstances, call for divergent readings of parts of § 707(b)(2)(A), the procedural context within which *Ransom* was decided nonetheless forecloses that possibility here. That is because, while at first blush *Ransom* ostensibly established an individualized approach to car loan payments only in Chapter 13 cases, upon closer examination one finds that *Ransom* went further, specifically abrogating the two Circuit Court cases that had allowed a categorical approach to car loan payments in Chapter 7 cases. See *Krawczyck v. Lynch*, Case No. 12-cv-643, slip op. at 10 (E.D.N.C. June 17, 2013) (citing *Ransom*, 131 S. Ct. at 723 n. 4, wherein *In re Tate,*571 F.3d 423 (5th Cir. 2009) and *In re Ross–Tousey,* 549 F.3d 1148 (7th Cir.

2008) are cited as two of the three Circuit cases comprising—ultimately—the wrong side of the circuit-split on the issue of car payment deductions in the means test).

Meanwhile, the conclusion that "the debtor's" means the same thing throughout § 707(b)(2)(A) is compelled by the provision's very structure. Recall that subsections (ii) and (iii) of § 707(b)(2)(A) both set forth expense deductions that are permissible in the means test. Recall too that subsection (iii), the focus of the case at bar, delineates the scope of a *particular* deduction available in the means test: those for "the debtor's average monthly payments on account of secured debts." § 707(b)(2)(A)(iii). The *general* bundle of available deductions, in contrast, is delineated in subsection (ii), which of course immediately precedes subsection (iii). *See* § 707(b)(2)(A)(ii)(I)-(V). For two reasons, this Court concludes that § 707(b)(2)(A)(ii)(I) is the operative provision of § 707(b)(2)(A), such that interpretations of § 707(b)(2)(A)(ii)(I)—like the one in *Ransom*—are likely to bear upon the interpretation of related provisions elsewhere in § 707(b)(2)(A). One such related provision is § 707(b)(2)(A)(iii).

The first indication of the primacy of § 707(b)(2)(A)(ii)(I) appears in the four clauses that follow it. Each of those clauses introduces an additional, permissible deduction, and each does so in a manner that acts to *qualify* § 707(b)(2)(A)(ii)(I)—namely, all four of the clauses begin with the words "In addition,…." *See* §§ 707(b)(2)(A)(ii)(II)-(V). By the same token, § 707(b)(2)(A)(iii), too, represents a qualification of the terms of § 707(b)(2)(A)(ii)(I). In particular, § 707(b)(2)(A)(iii) appears to occupy a gap created by § 707(b)(2)(A)(ii)(I)'s injunction that "[n]otwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payments for debts." Together, § 707(b)(2)(A)(iii) and § 707(b)(2)(A)(ii)(I) evince that under § 707(b)(2)(A), the *only* debt payments that may be deducted as expenses in the means test are those for *secured* debts.

14

Put another way, § 707(b)(2)(A)(ii)(I)'s prohibition against debt expense deductions operates to supersede any conflicting provisions of *that* clause, but not of *other* clauses; and by inhabiting the space thus created, § 707(b)(2)(A)(iii) exists in consonance with § 707(b)(2)(A)(ii)(I). In this way, the structure of § 707(b)(2)(A) suggests that § 707(b)(2)(A)(ii)(I) bears upon the interpretation of § 707(b)(2)(A)(iii). This supports the conclusion that "the debtor's" should be read the same way in the two provisions.

In conclusion, there are sound textual, structural, precedent-based, and policy-based reasons to conclude not only that the phrase "the debtor's" should be read in § 707(b)(2)(A)(iii) the same way that the *Ransom* court read it in § 707(b)(2)(A)(ii)(I), but also that the phrase should be read in this Chapter 7 case the same way that the *Ransom* Court read it in the context of a Chapter 13 case. Here as in *Ransom*, "[r]equiring a debtor to incur the kind of expenses for which he claims a means-test deduction…advances BAPCPA's objectives." *Ransom*, 131 S. Ct. at 721.

During the time this case was under advisement, the Supreme Court issued another opinion in which it interpreted the import of an enumerated item in the Bankruptcy Code being identified as the "debtor's." *See Clark v. Rameker*, 134 S. Ct. 2242 (2014). In *Rameker*, the Court was asked to decide whether a debtor could exempt inherited retirement funds (thereby shielding them from creditors) under the provision permitting exemption of "retirement funds to the extent that those funds are in a fund or account that is exempt from taxation under [certain sections] of the Internal Revenue Code of 1986." 11 U.S.C. § 522(b)(3)(C). Albeit in the context of interpreting Chapter 5 of the Bankruptcy Code, not Chapter 7, the *Rameker* Court arrived at its conclusion through reasoning that supports this Court's conclusions here.

Based on the text and purpose of § 522(b)(3)(C), the *Rameker* Court held that a debtor may only exempt the debtor's own retirement funds—not inherited retirement funds. In reaching this conclusion, the *Rameker* Court was faced with the argument that because "many of § 522's other exemptions refer to the 'debtor's interest' in various kinds of property[,…while] Section 522(b)(3)(C)'s retirement funds exemption [does not,]….. Congress must have meant the provision to cover funds that were at one time retirement accounts, even if they were for someone else's retirement." *Rameker*, 134 S. Ct. at 2248-2249.

Not so, found the Court, because "Congress used the phrase 'debtor's interest' in the other exemptions in a different manner—not to distinguish between a debtor's assets and the assets of another person but to set a limit on the value of the particular asset that a debtor may exempt." *Rameker*, 134 S. Ct. at 2249. It did not follow, therefore, that the absence of that phrase in the provision enumerating the retirement funds exemption meant that the exemption could apply to retirement funds other than those set aside by the debtor for the debtor's own retirement. In point of fact, adduced the Court, "Congress had no need to use the same 'debtor's interest' formulation in § 522(b)(3)(C) for the simple reason that it imposed a value limitation on the amount of exemptible retirement funds in a separate provision, § 522(n)." *Rameker*, 134 S. Ct. at 2249.

As in *Ransom*, it was shown in *Rameker* that in the Bankruptcy Code, where the phrase the "debtor's" precedes certain statutorily enumerated pecuniary interests, the effect is to limit the value that the debtor may claim in those interests. Unlike in *Ransom*, it was further shown in *Rameker* that where there exists a limitation on such an interest in a separate statutory provision, the phrase the "debtor's" may prove dispensable in the provision enumerating such interest. The upshot is that with regard to the import in the Bankruptcy Code of identifying a pecuniary

interest as "the debtor's," the exception in *Rameker* appears to prove the rule of *Ransom*: the phrase "the debtor's" serves a limiting purpose. In this case, it limits the deductions that a debtor may take for secured debt payments to those that the debtor actually will incur.

Lastly, this Court is not persuaded by a final argument made by the Debtor, which, as expressed by the *Fredman* court, "insists that adopting the forward looking approach blurs the distinction between the presumption of abuse test, 11 U.S.C. § 707(b)(2), and the totality of the circumstances test. 11 U.S.C. § 707(b)(3)(B)." *Fredman*, 471 B.R. at 554. This Court agrees with the *Fredman* court that

> This argument is not convincing because the breadth of the tests are wholly different. Under § 707(b)(2)(A)(iii), a Court is evaluating a discrete issue— whether a nonexistent payment for property that a chapter 7 debtor [is] surrender[ing] may be deducted in determining disposable income. The totality-of-the-circumstances inquiry goes far beyond that question and examines [many] factors. Therefore, application of a realistic approach in the instant case is not precluded by the existence of a totality of the circumstances test.[5]

*Id*.

Based on the foregoing, this Court concludes that in implementing the Chapter 7 means test, a debtor may not deduct secured debt payments on collateral the debtor does not intend to

---

[5] In determining whether abuse exists under the totality of the circumstances pursuant to § 707(b)(3), courts in this Circuit are guided by *Green v. Staples (In re Green)*, 934 F.2d 568, 570 (4th Cir.1991). *See Calhoun*, 650 F.3d at 341 n.2, which sets forth the following "*Green*" factors:
(1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability or unemployment;
(2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
(3) Whether the debtor's proposed family budget is excessive or unreasonable;
(4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the debtor's true financial condition; and
(5) Whether the petition was filed in good faith.

retain. In this case, this Court finds by a preponderance of the evidence that the Debtor does not intend to retain her home. At hearings on this matter, no testimony has been offered to the effect that the Debtor intends to retain the home. On the contrary, when the Debtor was asked at the § 341 meeting whether she intended to retain the home, she *twice* answered that she probably would *not* retain it. Unsurprisingly, she has not exempted the property. In addition, the Debtor registered no opposition to BB&T's motion for relief from stay as to the real property. Moreover, she was six months in arrears on mortgage payments at the time of that motion. According to the Debtor's Statement of Financial Affairs, she made no payments to BB&T in the ninety days preceding the filing of her petition. The Debtor's last full payments on either mortgage were in April 2013 and March 2013. There is no indication that she has made any post-petition payments. Finally, the Debtor has yet to satisfy her obligation under the Bankruptcy Code to assert intent either to retain or to surrender the property. This is an omission that tends to show abuse. *Cf. In re Crink*, 402 B.R. 159, 174 (Bankr. M.D.N.C. 2009).

For all these reasons, this Court concludes that the Debtor does not intend to retain her home. Therefore, the Debtor improperly deducted the mortgage payments in her Chapter 7 means test calculation.

## II. Interpretation of Section 707(b)(2)(A)(iii)(II)

The analysis above applies equally to § 707(b)(2)(A)(iii)(II), which sets forth the second part of the sum comprising the deduction permissible for "the debtor's average monthly expenses on account of secured debts": "any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of [title 11], to maintain possession of the debtor's primary residence," divided by sixty. In implementing the Chapter 7 means test, a debtor may not deduct secured debt arrearage payments on collateral the debtor does not intend to retain.

Having found in this case that the Debtor does not intend to retain her home, this Court concludes that the Debtor improperly deducted the mortgage cure payments in her Chapter 7 means test calculation.

## **CONCLUSION**

Based on the foregoing, the BA's motion is GRANTED. The Debtor must take the standard housing deduction and move both of her claimed mortgage deduction amounts to her income. The Debtor's recalculated sixty-month disposable income exceeds $12,475, rendering her filing presumptively abusive. No special circumstances exist to rebut this presumption. Dismissal or conversion to a case under Chapter 13 is required. If the Debtor consents, this case is ordered converted to a case under Chapter 13. Otherwise, this case is dismissed.

END OF DOCUMENT

SERVICE LIST

Linda Sue Teaster Hamilton
Debtor

Thomas Anderson
Attorney for Debtor

William Miller
Robert Price
Bankruptcy Administrator

W. Joseph Burns
Trustee